## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Rachel L. Robinson, being first duly sworn, herby depose and state follows:

### Introduction and Agent Background

1.      I am a Special Agent/Criminal Investigator with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and as a Special Agent of the United States Department of Homeland Security, I am authorized as an officer of the United States to conduct investigations and make arrests for offenses enumerated in Titles 8, 18, and 19 of the United States Code.  I have been employed by HSI since May 2007.  Prior to that assignment, I was employed as a Customs and Border Protection Officer with Customs and Border Protection for over 4 years.  I am currently assigned to conduct investigations in the Resident Agent in Charge (RAC) Providence Office of HSI.  I have prepared numerous affidavits in support of applications for federal search and arrest warrants.  As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2.      I am submitting this affidavit in support of a search warrant directed to Facebook, an internet service provider to search for evidence in furtherance of my investigation into violations of federal law, including charges 18 U.S.C. § 922(g)(1) (Felon in Possession of Firearm or Ammunition), 18 U.S.C. § 922(l) (Unlawful Importation of Firearms) (2 counts) and 18 U.S.C § 922(g) (3) Marijuana User in Possession of Firearm.

   a. Facebook account identified as

     https://www.facebook.com/david.worster.10  that is stored at premises owned, maintained, controlled or operated by Facebook, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California 94025.

3.      The information set forth in this affidavit is based on my investigation, my training and experience, and information relayed to me by other law enforcement

agents.  This affidavit is intended to show that there is probable cause for the requested

warrant and does not set forth all of my knowledge about this matter or investigation.

    4.      As described below, there is probable cause to believe that

- in 2020, silencer parts were ordered in the name of WORSTER, who is a felon, the order was fulfilled by one or more persons or entities located abroad, the silencer parts were shipped to WORSTER in or around December 2020, and parts were intercepted and seized prior to WORSTER's receipt of them,

- in 2021, a silencer was ordered in the name of WORSTER's girlfriend (a woman with whom he resides), the order was fulfilled by one or more persons or entities located abroad, the silencer was shipped to CARL in or around June or July 2021, and that silencer was intercepted and seized prior to WORSTER's receipt of it,

- the contents of each shipment on declaration or manifest documents was misrepresented, with one listed as "shoe charm" and the other as "fuel filter" and form for importation of a "firearm," which includes a silencer, was submitted in connection with either shipment,

- as of September 1, 2021, WORSTER possessed a .22 caliber rifle and ammunition, which was recovered by police, and

- as of September 1, 2021, WORSTER was in possession of another firearm, a pistol which has not been recovered by police.

There is accordingly probable cause to believe that WORSTER brought silencers into the

United States in violation of 18 U.S.C. § 922(l); unlawfully possessed both a rifle and

ammunition, in violation of 18 U.S.C. § 922(g)(1); and continues to possess a semi-

automatic pistol, in violation of 18 U.S.C. § 922(g)(1).  Also as described below, there is

probable cause to believe that WORSTER'S Facebook account, which is identified

above, contains admissions and information relating to the aforementioned offenses.

## Probable Cause to Believe Worster Committed Crimes

    5.      In 2008, the Bureau of Alcohol, Tobacco and Firearms ("ATF")

encountered David WORSTER in Massachusetts.  ATF Special Agent Christian Jardin's

review of ATF's investigative database revealed that in 2008, ATF's office in

Massachusetts conducted an undercover ("UC") cocaine and gun buy from WORSTER. According to information provided by Special Agent Jardin, a search warrant was executed on WORSTER's storage locker in which they discovered two pipe bombs.

6.     Based on that investigation, on December 5, 2008, WORSTER was arrested and ultimately charged and convicted on the Massachusetts offenses of unlawful possession of a firearm, unlawful possession of ammunition, two counts of possession of explosive device, and resisting arrest. His overall sentence, a product of multiple sentences that ran concurrently, was three to five years of incarceration.

7.     On or about April 6, 2009, WORSTER was arrested and ultimately charged and convicted on the Massachusetts offenses of unlawful possession of a firearm, unlawful possession of ammunition, and possession with intent to distribute cocaine. His overall sentence, a product of multiple sentences that ran concurrently, was two and a half to five years. The overall sentence for this offense ran concurrently with the overall sentence for the convictions mentioned in the paragraph above.

### *Residence*

8.     WORSTER and Alexzandria Carl ("Carl") reside together in Apartment 2R at 36 Hilton Street in Pawtucket, Rhode Island (hereinafter "the Residence"). Their names appear on the building mailbox for Apartment 2R, along with a note specifying that packages are to be left at the backdoor. R.I. Department of Motor Vehicle records list the Residence as Carl's address. The United States Postal Inspection Service confirmed with the mail carrier who delivers mail to 36 Hilton Street that Carl and WORSTER are receiving mail at the Residence and also specified that Carl and WORSTER requested that all packages be delivered to the building's back door. On August 10, 2021, Postal Inspector Michael Maccarone queried propriety postal databases. Information from those databases revealed that parcels had been delivered to "Alexzandria Carl" and to "David Worster" at the Residence. Finally, on September 1, 2021, following execution of a search warrant at the address and after being issued a

*Miranda* warning, WORSTER admitted that he has been living at the Residence for the past five years.

***Most Recent Parcel Containing A Silencer***

9.      On August 3, 2021, at the JFK Mail Branch, United States Customs and Border Protection ("CBP") was conducting an enforcement examination of mail from China.  CBP conducted an examination of a parcel that was declared on a customs declaration or manifested to contain a "Shoe Charm."  While examining this parcel, hereinafter referred to as the "Subject Parcel," CBP found that it contained a silencer (or suppressor).  The consignee (or recipient) on the Subject Parcel was listed as "Alexzandria carl, 36 hilton ST 2R, Pawtucket Rhode Island, 02860, US United States of America."  The Subject Parcel label also contained phone number "(401) 7719598."  (According to a cellular telephone directory utilized by law enforcement that number is registered, through Metro PCS, to Carl's cellular telephone.)  The shipper of the Subject Parcel was listed as "Zhenming Chen, Quan Zhou Shi Jin Jian Shi Songyuan road NO. 16 Floor 3 Shengda."  The Subject Parcel was being shipped via United States Postal Service ("USPS") and displayed tracking number "LY820820718CN."

10.      On the customs declaration, the contents of the Subject Parcel were manifested as follows:

| No | Qty | Description of Contents | Kg. | Val(US$) | Goods Origin |
|----|-----|-------------------------|-----|----------|--------------|
| 1  | 3   | Shoe charm              | 0.566 | 6.0    | CN (China)   |

11.      The following also appears on the customs declaration:  "I certify the particulars given in this customs declaration are correct. This item does not contain any dangerous article, or articles prohibited by legislation or by postal or customs regulations. I have met all applicable export filing requirements under the Foreign Trade Regulations."

4

12.     According to the CBP incident narrative and according to 18 U.S.C. § 921(a)(24), the term "firearm silencer" or "firearm muffler" "mean[s] any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." Under the National Firearm Act, the making a silencer must be approved in advance by ATF. An unlicensed person must file an ATF Form 1, Application to Make a Firearm, pay a $200 fee or tax, and comply with all other provision of the law prior to making a silencer. Approval of Form 1 results in registration of the silencer to the maker. Subsequent transfer of the registered silencer must be approved in advance by ATF. In addition, defense articles cannot be imported into the U.S. from China because of Section 447.52(A) of the Arms Export Control Act. (18 U.S.C. § 921 (a)(24)). The suppressor was seized under 19 U.S.C. § 1595a(c)(1)(c), 49 U.S.C. § 80302(a)(2) Non-Cafra.[1]

13.     On August 4, 2021, CBP notified HSI in Providence of the seizure of the silencer addressed to "Alexzandria Carl" at the Subject Premises. I learned of that seizure the same day, and I also subsequently learned that the Subject Parcel first arrived in the United States on or about July 12, 2021.

14.     I checked with United States Postal Inspection Service (USPIS) on the tracking number of the Subject Parcel and was advised that the delivery status of the parcel had been checked multiple times by a persons or entities using IP addresses associated with China. The last check occurred on August 25, 2021.

---

[1] Under 18 U.S.C. § 922(g)(1), it is "unlawful for any person . . . previously convicted of a crime punishable by imprisonment for a term exceeding one year to possess a firearm." Section 921(a)(3) defines the term firearm to include "(C) any firearm muffler or firearm silencer." 26 U.S.C. § 5861(d) specifies that it is "unlawful for any person... to receive or possess a firearm which is not registered to him in the National Firearms Registry and Transfer Records[,]" and "firearm" there is defined to include a silencers.

15.     On August 06, 2021, the device manifested as a "Shoe charm" was examined and photographed by ATF Special Agents. The photographs were shared with a Firearms Enforcement Officer of the ATF Firearms Technology Industry Services Branch ("FTISB") who examined the photographs and determined, based on a review of the photographs, that the device was consistent in appearance with a firearm silencer, namely that it was consistent in appearance with devices that had previously been examined by FTISB and found to be silencers.

16.     On August 09, 2021, Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent Christian Jardin confirmed that WORSTER and Carl were not registered with the National Firearm Registration and Transfer Record ("NFRTR") as possessing any firearm regulated by the National Firearms Act ("NFA").  Special Agent Jardin also confirmed that WORSTER and Carl did not have any pending applications with the NFRTR.  The NFRTR is the central registry of all NFA firearms in the U.S. which are not in the possession or under the control of the U.S. Government.  The registry includes (1) the identification of the firearm, (2) date of registration, and (3) identification and address of the person entitled to possession of the firearm (the person to whom the firearm is registered).

### *Previous Parcel Containing Silencer Parts*

17.     On August 10, 2021, HSI Providence received information from HSI Boston Task Force Officer Sgt. Sean Barry regarding a previous seizure by Customs and Border Protection (CBP) of suppressor parts destined for WORSTER at "156 Taunton Ave, 152, Seekonk Massachusetts 02771."  156 Taunton Ave is the address for the United States Post Office building in Taunton and 152 is the post office box number for WORSTER at that post office building.  (WORSTER presently has an active Massachusetts driver's license and Massachusetts DMV records list WORSTER's primary contact address as that license is listed as 156 Taunton Avenue, PO Box 152, Seekonk, Massachusetts 02771.)

18.     On December 26, 2020, CBP was conducting an enforcement examination of mail from China.  CBP conducted an examination of a parcel that was declared on a customs declaration or manifested to contain a "Fuel Filter."  While examining this parcel, CBP found it to contain silencers or suppressor parts (specifically baffles).  The consignee on the Subject Parcel was listed as "David Worster, 156 Taunton Avenue 152, Seekonk, MA 02771."  The parcel label also contained phone number "401-481-4207." (According to a cellular telephone directory utilized by law enforcement that number is registered, through Metro PCS, to Carl's cellular telephone.)  The shipper of the Subject Parcel was listed as "Winnie-W, Dong shan Jing Ji Kai Fa Qu Shang Dong lu 211-3 Hao 3 Lou 303, Rui An Shi Wen Zhou Shi, China."  The Subject Parcel was being shipped via United States Postal Service ("USPS") and displayed tracking number "LY572724722CN."

19.     On the customs declaration, the contents of the parcel were manifested as:

| No | Qty | Description of Contents | Kg. | Val(US$) | Goods Origin |
|----|-----|------------------------|------|----------|--------------|
| 1  | 2   | Fuel Filter            | 0.26 | 5.0      | CN (China)   |

20.     The following also appears on that customs declaration:  "I certify the particulars given in this customs declaration are correct. This item does not contain any dangerous article, or articles prohibited by legislation or by postal or customs regulations. I have met all applicable export filing requirements under the Foreign Trade Regulations."

### Inference from False Descriptions of Parcel Contents

21.     Based on common sense, I infer from the false descriptions of the contents of the parcels – the declaration description of the silencer as a "shoe charm" and silencer parts as "fuel filter" – that these parcels were not shipped or sought following firearm

import procedures, which involves submission of an ATF Form 6 (application to import) and the imported firearm being stored at a customs bonded warehouse which releases the firearm on presentation of an approved ATF Form 6.  The false descriptions of the parcel contents indicate an effort to bypass the firearm importation regulatory process.

22.     Furthermore, I am advised by Special Agent Jardin, who checked a database of AFT Form 6 submissions maintained by ATF's importation branch, that there is no record of any Form 6 having ever been submitted by or on behalf of either WORSTER or Carl and that there is no such application pending in either name.

### Execution of Search Warrant at the Residence

23.     On the morning of September 1, 2021, agents executed a warrant to search WORSTER and Carl's residence.  In the master bedroom, agents found a .22 caliber rifle in plain view and without any lock or restraining mechanism a .22 caliber Henry US Survival rifle, which indicates on its exterior that it was made in Bayonne, New Jersey; multiple ammunition magazines containing .22 caliber rounds, 9 mm rounds, and .223 caliber ammunition; and a bag of .22 caliber rounds.  Also found in the bedroom were tools for making firearms, specifically tools for making firearms, and firearm component parts.

24.     After being issued a *Miranda* warning, WORSTER admitted, among other things, the following to agents, including HSI Taskforce Officer Matthew Smith:

    a.     He had ordered both the aforementioned parcels from China and knew that they were being held by CBP or customs authorities.  He detailed that after the first package got held by customs, he ordered the second one in his girlfriend's name.  He explained that he ordered the items via the internet.  He admitted that the ordered items could be used in the construction of firearm suppressors or silencers, but suggested that they could also be used for other purposes.  He also explained that he

had watched online videos that showed how to use the items that he had ordered to make silencers.

   b.   He admitted that he had access to the .22 caliber rifle and would have used it had anyone broken into his apartment, and he said that Carl had bought it and that it was in her name.  He admitted that he had access to the rifle.  He said that he might have touched the rifle.

   c.   When he was asked about the magazines and ammo that did not correspond to the .22 caliber rifle, initially he said that he had other guns.  Shortly thereafter, he backtracked and said that he "could" have other guns.

   d.   About the firearm component parts found in the bedroom, he admitted that he had obtained them by mail order through various online websites.  He further said that he was going to build a firearm but claimed that he never did.

   e.   He at various points claimed that his girlfriend, Carl, had an interest in firearms and suggested at various points that the rifle, magazines, and ammunition were tied to or associated with her.  (Carl, who was interviewed later, also suggested that she was tied to or associated with the items.)

   f.   He acknowledged that as agents were trying to make entry through his backdoor, he went to his front door and was surprised that no one was outside his front door.  He further acknowledged that as agent were trying to make entry into his apartment, he "went somewhere."

   25.   There is also reason to believe that WORSTER possessed an additional firearm, which has not yet been recovered.

   a.    On September 1, 2021 at or around shortly after 6 am, agents commenced executed of these warrants by making entry into the building that WORSTER's apartment, 2R, through one of two rear doors, specifically the door that WORSTER had previously been seen using in earlier surveillance.  That door provided access to a rear stair well for the R apartments – apartments 1R, 2R, and 3R.

26.     After agents had entered the rear stair well for the R apartments, another agent who was posted in the backyard noticed WORSTER exit another rear door, the rear door for the stair well providing door providing access to the L apartments, apartments 1L, 2L, and 3L.  Shortly thereafter, agents entered the rear stair well for the L apartments and found WORSTER in front of the rear door for apartment 2L, the Neighbor's Apartment.  When the agents encountered WORSTER the rear door to apartment 2L was open.

27.     At or around the same time as agents were entering the rear stair well for the R apartments, an agent at the front of the building encountered a male exiting the front door.  The male told the agent that he resided in one of the third-floor apartments and that he had a short time earlier encountered WORSTER on the front second-floor landing in front of the door to Apartment 2L.  The male said that WORSTER was holding a black pistol.[2]  The male said that WORSTER asked him to hold the pistol for him, and the male declined.  The male said he then saw WORSTER enter Apartment 2L.  The male said he returned to his third-floor apartment and told his wife to lock the door, and then the male descended the front stair well, exited the building front door, and encountered the agent.

### AliExpress Account

28.     During the post Miranda interview of WORSTER on September 01, 2021, he stated that he ordered the two parcels from China that were seized by CBP using his AliExpress account.   WORSTER made statements to Agents during the interview that he orders packages from China sometimes. He stated he can order anything off there, they sell items that are "legal til you can make it illegal."  He stated he ordered one of

---

[2] I spoke to this man in the last few days, and he further specified that as a former member of the military he was familiar with firearms, that he saw WORSTER holding an object that was consistent in appearance with a black pistol, that WORSTER's hand was covering the area of the trigger, and that the barrel and handle areas were visible and were consistent in size and appearance with a pistol.

the subject parcels, it did not arrive, and so he then ordered another in the name of his girlfriend Alexzandria CARL. In addition, the AliExpress application was observed on the Samsung cell phone belonging to WORSTER that was seized by HSI.

29.     A Grand Jury Subpoena was served to Donald J. Wyatt Detention Facility requesting any communications made by WORSTER to include video chat, texts, phone calls.  During a phone call with WORSTER's sister Yolanda Travieso, WORSTER told her to log in to his AliExpress account and print out certain order histories to provide to his attorney.  He provided his login information as "davidworster1986@gmail.com" and password "holyoke413."  In that same conversation, he advised her that there was a package that had not yet arrived that contained "like a little light".  He advised her to "leave that out, it has nothing to do with it."  WORSTER advises her to print out an order, and she reads a croc shoe charm, car fuel filter and handlebar bike grips, anti-skid.  He also advised her to print out the order from December describing them as little black caps, solvent trap caps, and his sister read it back to him as storage cup seal filter. She then reads the description as 8 primed aluminum storage cup seal filter for Napa 4003.

30.     According to an online search, AliExpress is Alibaba Group's international marketplace for buyers and sellers. Selling millions of products with no retail markups because its coming from Chinese and International suppliers. Users can shop in 18 languages.  It is believed that access to his account will show evidence of ordering firearm parts to include the subject parcels.

31.     I reviewed AliExpress's website, which was found at aliexpress.com, and note that the site appears to be organized in a manner similar to Amazon.com, and the site can provide account holders information about their past purchases or interactions with AliExpress.  For example, those with AliExpress accounts may review items previously ordered by clicking on "My Orders" from a drop-down menu, messages by reviewing "Message Center" from a drop-down menu, items placed on a wish list by

reviewing "Wish List" from a drop-down menu, and preferred vendors from prior orders by reviewing "My Favorite Stores." The "My Orders" menu allows account holders to review all orders, refunds and disputes, and credit card and bank information. The site also allows account holders to view the email address entered for communications with the account holders.

32.     On September 21, 2021, federal search warrants were obtained for davidworster1986@gmail.com and 401rifle@gmail.com, which were email accounts associated with WORSTER (*see generally 21-SW-486*). In his email account davidworster1986@gmail.com, observed was daily emails from firearms sellers concerning firearms, ammunition and accessories. Also observed was Ali Express order information and promotional emails.

33.     On September 21, 2021, a federal search warrant was obtained for information related to WORSTER's AliExpress account which revealed purchase history of firearm parts and accessories *(see generally 21-SW-485)*.

## Probable Cause to Search Worster's Facebook Account

34.     On December 10, 2021, your affiant observed a Facebook, Inc account in the name of "David Worster." A review of the "About Info" shows Places Lived: Holyoke, Massachusetts; Contact Info: /david.worster.10. The account displayed a profile picture of a falcon updated on November 3, 2021. The account also displayed a cover photo of Native American symbols updated on November 1, 2021. In addition, the following posts appear in the feed:

        a.     On November 12, 2021 at 6:33pm WORSTER posted "Then the government wants to say that my crimes be serious and I shouldn't be released on bail but this freak they let go to a far away state with no problem but wanted to hold me lol this is justice in America where shaw crying for him to be held." This post contained an article from Justice.gov titled "Rhode Island Priest Appears in Federal Court of Charges of Distributing, Receiving Child Pornography."

b.     On November 2, 2021, WORSTER posted "When playing warzone me and my son all we you do is win win win."

c.     On October 31, at 10:10 PM WORSTER posted a letter addressed to "DAVID MICHAEL WORSTER[,] 45 NASH STREET, CHICOPEE[,] MA 01013."  The letter, a notice that an application had been received, specified that David Michael Worster's date of birth was April 9, 1986.

d.     On October 31, 2021 at 8:46 PM , WORSTER posted "True American values" with a picture that states "We will not go quietly into the night! We will not vanish without a fight! We're going to live on, we're going to survive."

e.     On October 25, 2021 at 4:24 PM WORSTER posted "These are the real heroes of America if you don't know our history look it up guns are not only for violence they are also to deter violence this is why we have the right to bear arms to scare off the tyrant's.  Underneath the post was image that contained a definition of Minutemen stating "Minutemen were civilian colonists who independently formed militia companies self-trained in weaponry, tactics, and military strategies, comprising the American colonial partisan militia during the American Revolutionary War. They were known for being ready at a minute's notice hence the name.  Minutemen provided a highly mobile, rapidly deployed force that enabled the colonies to respond immediately to war threats."

35.     There is probable cause to believe that this account belongs to WORSTER, because of the following:

a.     the reference to his crime and bail,

b.     according to Accurint, a person locater database, WORSTER lived in Holyoke, Massachusetts and in Chicopee, Massachusetts, and

c.     the letter referencing April 9, 1986 as his birthday, which is according to criminal history records WORSTER's actual birthday.

36.     Based on WORSTER's posting concerning the right to bear arms, I believe that there is probable cause to believe that he posts material and uses Facebook to communicate in way that would indicate that he possesses firearms and has an interest in firearms, all material and information probative of his illegal possession of firearms. Additionally, as described in background below, the information sought from Facebook would additionally provide the following additional sorts of pertinent information: identification information about the account holder, the account user's network and group connections and interactions, the contents of postings and messages both private and public, information pertaining to WORSTER's personal interests or areas of Facebook exploration, and photographs and videos and the other classes of data set forth in Attachment B.

37.     On December 10, 2021, a preservation request was served to Facebook, Inc. relating to https://www.facebook.com/david.worster.10

### Background Concerning Facebook, Inc.'s Accounts

38.     PROVIDER, is Facebook, Inc., of the internet-based account(s) identified by username https://www.facebook.com/david.worster.10.

39.     Facebook, Inc., owns and operates a free-access social networking website of the same name that can be accessed at https://www.facebook.com ("Facebook").  The website is owned and operated by Facebook, Inc.  Facebook, Inc. allows Facebook users to establish accounts with Facebook, Inc., and users can then use their Facebook accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

40.     Facebook Inc. asks users to provide basic contact and personal identifying information to Facebook Inc., either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code),

14

telephone numbers, screen names, websites, and other personal identifiers.  Facebook Inc., also assigns a user-identification number ("user ID") to each account.  Facebook, Inc., identifies unique Facebook accounts by a user's e-mail address, the user ID, or the username associated with a Facebook profile.

41.      Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook Inc., assigns a group identification number to each Facebook group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "friend" request.  If the recipient of a "friend" request accepts the request, then the two users will become "friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "friends" and a "News Feed," which highlights information about the user's "friends," such as profile changes, upcoming events, and birthdays.

42.      Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook "friends" to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

43.      Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the

event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

44.     Facebook, Inc., allows Facebook users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides Facebook users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video.  When a user is "tagged" in a photo or video, he or she receives a notification of the "tag" and a link to see the photo or video.  For Facebook Inc.,'s purposes, the photos and videos associated with a Facebook user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user "tagged" in them.

45.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook Inc., unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

46.     In general, user-generated content and information about the account (such as a user's photos, "status" updates, an activity log as described below, and the like) that is written using, stored on, sent from, or sent to a Facebook Inc.,

account can be indefinitely stored in connection with that account, unless the subscriber deletes the material.  Further, such user-generated content can remain on Facebook Inc.,'s servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Facebook Inc.,'s servers for a certain period of time.

47.     A Facebook user also can send other Facebook users a notification indicating that the recipient has been "poked".  Facebook "pokes" enable Facebook users to get the attention of other Facebook users without delivering any user generated messages or other content.

48.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

49.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

50.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

51.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos in which the user has been "tagged", as well as connections made through the account, such as "liking" a Facebook page or adding someone as a "friend".  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

52.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

53.     In addition to the applications described above, Facebook Inc., also provides Facebook users with access to thousands of other applications ("apps") on the

Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

54.     Facebook Inc., also retains Internet Protocol ("IP") logs for a given Facebook user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

55.     Depending on the user's privacy settings, Facebook Inc., may also obtain and store the physical location of the user's device(s), including Global Positioning System ("GPS") data, as the user interacts with the Facebook service on those device(s).

56.     Social networking providers like Facebook Inc., typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook Inc., about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook Inc., typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider, or user as a result of the communications.

57.     Based on my training and experience, I know that providers such as Facebook Inc., also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet

computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by FACEBOOK, INC., in order to track what devices are using FACEBOOK, INC.'s accounts and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Facebook Inc., accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Facebook, Inc. account.

      58.      Facebook Inc., also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices.  This application is associated with the subscriber's Facebook Inc., account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider., associated with the application (such as FACEBOOK, INC.,) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/Facebook, Inc.,.  Thereafter, whenever the provider needs to send notifications

to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of Facebook Inc., are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's Facebook Inc., account via the mobile application.

59.     Based on my training and experience, I know that providers such as Facebook Inc., use cookies and similar technologies to track users visiting Facebook Inc.'s webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to Facebook Inc.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as Facebook Inc., may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Facebook Inc., account and determine the scope of criminal activity.

60.     Based on my training and experience, I know that Facebook Inc., maintains records that can link different Facebook Inc., accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Facebook Inc., accounts.  Based on my training and experience, I also know that

evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Facebook Inc., account.

61.        Based on my training and experience, I know that subscribers can communicate directly with Facebook, Inc., about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as Facebook, Inc., typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

62.        In summary, based on my training and experience in this context, I believe that the computers of Facebook, Inc., are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for Facebook Inc., subscribers), as well as Facebook Inc.,-generated information about its subscribers and their use of Facebook Inc., services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide Facebook Inc., with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

63.        As explained above, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by

Facebook Inc., can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and "tagged" photos (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described above, Facebook Inc., logs the IP addresses from which Facebook users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook Inc., builds geo-location into some of its Facebook services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account user.  Last, Facebook account activity may provide relevant insight into the Facebook account user's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).[3]

---

[3] At times, social media providers such as Facebook Inc., can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of Facebook Inc.'s services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

64.        Based on my training and experience, I know that evidence of who controlled, used, and/or created a Facebook Inc., account may be found within the user-generated content created or stored by the Facebook Inc., subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar Facebook Inc., accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

### Request to Submit Warrant by Telephone or other Reliable Electronic Means

65.        I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Milind Shah an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

**Conclusion**

66.        Based on the facts contained in this affidavit, I believe there is probable cause to cause to believe that the requested search warrant will reveal evidence of Federal Offenses committed by WORSTER, including, but not limited to, 18 U.S.C. § 922(g)(1) (Felon in Possession of Firearm or Ammunition), 18 U.S.C. § 922(l) (Unlawful Importation of Firearms) (2 counts) and 18 U.S.C § 922(g) (3) Marijuana User in Possession of Firearm.

65.     Based on the forgoing, I request that the Court issue the proposed search warrant.  Because the warrant will be served on Facebook Inc., who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.


_____
RACHEL L. ROBINSON
Special Agent
Homeland Security Investigations

| | |
|---|---|
| Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by **Telephone**_____. <br> (*specify reliable electronic means*) | |
| _____ <br> *Date* | _____ <br> *Judge's signature* |
| _____ <br> *City and State* | _____ <br> *Printed name and title* |

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the **Facebook, Inc.** account(s) identified by **https://www.facebook.com/david.worster.10** and which is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures**
**to Facilitate Execution of the Warrant**

**I.      Information to be disclosed by Facebook, Inc. ("FACEBOOK") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of FACEBOOK, including any records that have been deleted but are still available to FACEBOOK, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), FACEBOOK is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

> a.      For the time period **January 01, 2020 to Present,** The contents of any available messages or other communication associated with the Account (including, but not limited to, messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings,

images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof) and related transactional records for all FACEBOOK services used by an Account subscriber/user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each message or other communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

b.   For the time period **January 01, 2020 to Present:**  All photos and videos uploaded by the Account and all photos or videos uploaded in which the Account has been "tagged", including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

c.   Basic subscriber records and login history, including all records or other information regarding the identification of the Account, to include full name, physical address, telephone numbers, birthdate, security questions and passwords, and other personal identifying information, records of session times and durations, the date on which the Account was created, the length of service, types of services utilized by the Account, the IP address used to register the Account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all Facebook user

identification numbers ("user IDs") that logged into Facebook by the same machine as the Account;

d.      For the time period **January 01, 2020 to Present:**  All records or other information related to the Account, including address books, contact and "friend" lists, calendar data, and files; profile information; "News Feed" information; "Wall" postings; Notes; groups and networks of which the Account is a member; future and past event postings; rejected "friend" requests and blocked users; status updates (including relationship status updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked"; searches performed by the Account; privacy settings, including privacy settings for individual Facebook posts and activities; information about the Account's access and use of Facebook applications; and the Account's access and use of Facebook Marketplace;

e.      For the time period **January 01, 2020 to Present:**  All "check ins" and other location information;

f.      For the time period **January 01, 2020 to Present:**  All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

g.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers,

3

instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s)

h.    All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers; and

i.    Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Facebook, Inc. and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Facebook.  The attached records consist of

_____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b. such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

1

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____

Date                                    Signature